IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.S., *et al.*, *Plaintiffs* | : : : | CIVIL ACTION |
| v. | : : : | |
| COLONIAL SCHOOL DISTRICT, *Defendant* | : : | No. 19-2741 |

**MEMORANDUM**

PRATTER, J.                                                                                                        NOVEMBER 18, 2020

      A.S. is a nine-year old boy diagnosed with Autism Spectrum Disorder who lives with his parents within the Colonial School District.[1] He is entitled to special education under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. After conducting one day of administrative hearings, the hearing officer determined (1) Colonial did not deny A.S. a free and appropriate public education (FAPE) for the 2018-2019 school year; (2) A.S. was permitted to return to an "extended school year" program for Summer 2019, the tuition for which Colonial would reimburse; and (3) A.S. should be placed in Colonial's in-district specialized learning support classroom for the 2019-2020 school year where he would receive a FAPE.

      As is permitted under the Act, Parents appeal the first and third rulings. Parents contend that the parties agreed prior to the hearing that A.S. would be placed in a private school for the 2019-2020 school year. By disregarding this agreement in principle, the hearing officer allegedly erred both in ruling on an issue that was not before him and in finding that Colonial's specialized learning support classroom was appropriate. The parties cross moved for judgment on the

---

[1]     A.S. was nine years old and enrolled in third grade when Parents filed their motion for judgment on the administrative record in January of this year.

1

administrative record. The Court granted Parents' unopposed request to supplement the administrative record with, among other things, certain pre-hearing emails. Doc. No. 15.

For the reasons that follow, the Court vacates the hearing officer's decision and order in ODR File No. 21435/18-19 and remands to the hearing officer to proceed in accordance with the Court's memorandum.

## STATUTORY FRAMEWORK

To contextualize the facts of this case—as well as the alphabet soup of terminology—a brief overview of the Act is warranted. Under the IDEA, a state must provide a free and appropriate public education (FAPE) to eligible children. 20 U.S.C. § 1412(a)(1). Relevant here, autism is a recognized disability. The mechanism by which a FAPE is provided is the Individualized Education Program (IEP), a written statement identifying the child's present performance levels, goals, and concrete steps to evaluate and track the child's progress. 20 U.S.C. §§ 1412(a)(4), 1414(d). The Act requires that the school district offer an IEP that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013). A school district is not required to maximize a child's potential, but it fails to meet its obligation under the Act if it provides merely a minimal education process. *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist.*, 137 S. Ct. 988, 1001 (2017).

The Act provides that state and local educational agencies—in consultation with the child's parents or guardian—are responsible for best formulating an educational plan suitable for that child. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982). Parents are members of the IEP and are entitled to participate in the IEP process. 20 U.S.C. § 1400(c)(5)(B). Among other things, parents have a right to obtain an independent educational evaluation (IEE) of their child, the costs of which may borne by the public. 34 C.F.R.

2

§ 300.502(a). Parents, however, "do not have the right to control" the IEP. *K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 829 (E.D. Pa. 2011).

To the maximum extent possible, a student with disabilities should be educated with non-disabled peers. 34 C.F.R. § 300.114(a)(2). This requirement is interchangeably often referred to as the student's "least restrictive environment" or "mainstreaming." *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1209 (3d Cir. 1993). The Third Circuit Court of Appeals has adopted a two-part test to assess compliance with the least restrictive environment requirement. The court must first determine whether education in the regular classroom can be achieved "with the use of supplementary aids and services." If the Court finds that "placement outside of a regular classroom is necessary for the child's educational benefit, it must evaluate whether the school has mainstreamed the child to the maximum extent appropriate, *i.e.*, whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000) (quoting *Oberti*, 995 F.2d at 1215). The school bears the burden of proving compliance with the mainstreaming requirement. *Id.*

After the IEP is drafted, the school district's educational program offer is formalized in a Notice of Recommended Educational Placement (NOREP) which is provided to the parents. In Pennsylvania, the NOREP functions as the "prior written notice" required under § 1415 of the IDEA. *T.R. v. Sch. Dist. of Philadelphia*, 223 F. Supp. 3d 321, 325 (E.D. Pa. 2016). The NOREP gives notice that the school district has proposed a change to the child's educational program, which parents may accept or reject.

**BACKGROUND AND PROCEDURAL HISTORY**

The parties here have long disputed A.S.'s school placement. From pre-school through last year, A.S. received his education in specialized private school settings. Doc. No. 12 at 2.[2] The origin of the present dispute stems from Colonial's attempt to move A.S. when he was in first grade. At that time, A.S. received a hybrid education provided by The Meadowbrook School and A Step Up Academy (ASUA). ASUA provided special education programming on Meadowbrook's campus using pull-out services. This means that some of A.S.'s programming took place outside his general education classroom, although he stayed on Meadowbrook's campus.

In response to Colonial's attempt to move A.S. from his specialized setting, Parents filed a complaint.[3] The parties proceeded to a hearing where it was determined that Colonial's evaluation process for A.S. and report were "prejudicially flawed." Accordingly, the hearing officer (1) ordered an Independent Educational Evaluation (IEE) of A.S. by a qualified examiner and an Individualized Education Plan (IEP) meeting; (2) directed Colonial to fund both A.S.'s placement at Meadowbrook/ASUA and the costs of the IEE; and (3) explicitly established Meadowbrook as A.S.'s pendent placement.

**I.   The IEP and NOREP Process**

   **A. August 2018 IEP and IEE**

Over the summer, Dr. Angela Jones, who holds a Diplomate in School Neuropsychology and is a Licensed Psychologist and a Certified School Psychologist, evaluated A.S. to prepare the

---

[2]   At the oral argument on the pending motions, Parents confirmed that A.S. is now enrolled in his local in-district public school.

[3]   This earlier complaint was resolved and is mentioned only for background purposes.

4

IEE. Although Dr. Jones had not yet issued the IEE by August 2018—because she continued to observe A.S., ODR 21435 Hr'g Tr. at 61:6-13—Colonial convened the IEP team.

Parents were dissatisfied with the August 2018 IEP which recommended placement at the in-district elementary school and was prepared without the IEE. The parties were unable to reach a resolution through mediation, so Parents filed a complaint alleging deprivation of a FAPE.

Around the time Parents filed their complaint, Dr. Jones finished her independent evaluation of A.S. and issued the IEE report. Among her findings, Dr. Jones expressed "concern that the [current] fragmentation of [A.S.'s] educational program in an inclusion classroom with pull-out supports would negatively impact his learning." Admin. Rec. P-3 (IEE) at 40. She recommended that A.S. not be in a "self-contained setting with other students with autism." *Id.* at 39. Rather, according to Dr. Jones, A.S. should be placed in a small classroom setting in a "specialized school," which the IEE concluded was "necessary at this time." *Id.* at 40. This is because a specialized school setting would offer a more "coordinated and integrated" approach to A.S.'s academic, behavioral, and social goals that is "not possible in a neighborhood public school." *Id.*

### B. December 2018 IEP

With the benefit of the IEE, Colonial reconvened the IEP team in December 2018. Dr. Jones attended this meeting. She opined that the Meadowbrook/ASUA placement involved frequent disruptions to A.S.'s environment and limited his interaction with typically developing peers. ODR 21435 Findings of Fact ¶ 13. Dr. Jones concluded that the then current placement at Meadowbrook's Autistic Support Classroom was inappropriate in the long-term. Rather, A.S. should be placed in an academically oriented environment. *Id.* ¶¶ 14-15. Dr. Jones identified the Center School as a potential specialized school with limited transitions, small class size, and

teacher-to-student ratios that could accommodate A.S.'s needs. *Id.* ¶¶ 15-16; ODR 21434 Hr'g Tr. at 62:22-63:1.

Following the December 2018 IEP meeting, Colonial issued an amended IEP. The December 2018 IEP lists 30 separate items of program modifications and specially designed instruction including weekly occupational therapy, speech and language therapy, and consultation with a board-certified behavioral analyst.[4] In light of Dr. Jones's recommendation, the December 2018 IEP offered two placement options: the Center School and Whitemarsh Elementary School—the in-district public school. The December 2018 IEP noted that "[w]hile the District believes that A.S.'s IEP can be delivered at [Whitemarsh], we will support the recommendation [of the Center School]." Admin. Rec. S-12 (December 2018 IEP) at 42.

Colonial "specifically propose[d] the Center School in accordance with Dr. Jones's recommendation" in its Notice of Recommended Educational Placement. Admin. Rec. P-7 (January NOREP) at 3. The January NOREP provided that placement would start after Parents consented to issuing a referral and the Center School accepted A.S.

### C. The February 2019 NOREP

At this point, the parties appeared to agree in principle to placement at the Center School. The logistics of the plan, however, proved contentious. Upon receipt of the January NOREP, Parents amended their complaint on the grounds that Colonial proposed that A.S. be immediately transferred to the Center School.[5] The parties compromised to the effect that A.S. would complete the 2018-2019 school year at Meadowbrook/ASUA to minimize disruption. To memorialize this compromise, Colonial issued a revised NOREP which provided that A.S. enroll at the Center

---

[4]   Under the December 2018 IEP, A.S. did not qualify for Extended School Year (ESY) programming, although the parties eventually agreed he would attend ESY programming for Summer 2019.

[5]   Parents also sought to hold A.S.'s pendent placement at Meadowbrook. Hearing Officer McElligott issued an interim order that the pendent placement was at Meadowbrook/ASUA.

School for the 2019-2020 school year and that he be placed at the Center School for Summer 2019 ESY programming to ease the transition. Admin. Rec. S-7 (February NOREP). Again, placement was "contingent" on Parents' returning the consent form to begin the referral process and the Center School accepting A.S. February NOREP at 3.

The parties dispute whether Parents could selectively accept portions of the NOREP while rejecting other portions. Parents preferred that A.S. remain at ASUA's program for ESY 2019, which A.S. previously attended (and which Colonial previously funded). They were concerned that a signed NOREP would supplant the prior agreement and lock them into Colonial's proposed ESY program. Colonial advised Parents that they could execute the NOREP, designating the portions with which they agreed while reserving their rights. There is no evidence that Colonial offered to submit two separate NOREPs.

The contents of the NOREP were not the only sticking point as the parties approached the hearing date. Colonial issued three requests for Parents' consent to release A.S.'s records to the Center School. By the hearing, Parents had not yet consented.

## II. The March 2019 Hearing

While the parties debated whether Parents could selectively accept the NOREP, the hearing officer informed the parties that he would dismiss the school year placement claim only if Parents executed the document. Absent a signed NOREP, he planned to "take testimony from the independent evaluator regarding the logistics/timeline of the placement issue" and would also "take evidence on the ESY-2019 issue." In response, Parents expressed to the hearing officer their reluctance to execute the NOREP when they contested the ESY 2019 recommendation. The hearing officer did not respond to this concern nor did he direct Colonial to issue two NOREPs.

The NOREP remained unexecuted and Parents had not consented to the referral by the hearing date, so the hearing officer concluded that school year placement remained an open issue.

The hearing officer conducted a one-day hearing to consider both the school placement claim and the ESY 2019 claim. Finding that the "issues [were] rather focused and limited," he forewent opening statements. ODR 21435 Hr'g Tr. at 10:15-18. In his opening remarks, he instructed the parties he would not expect redirect or additional rounds of cross-examination. Parties were limited to one round of questioning. *Id.* at 11:15-20. Parents presented testimony from A.S.'s mother; a representative from ASUA, Marybeth Harmer; and Dr. Jones. Karen Berk, Director of Pupil Services and Special Education, testified on behalf of Colonial. Except for Ms. Harmer—whose testimony was limited to ESY—all witnesses offered testimony about the school year and ESY 2019 programming.

The hearing officer specifically refused to allow Parents to testify why they had not yet consented to the referral. Parents' counsel requested A.S.'s mother "provide an explanation as to why she did not immediately respond to the February emails received from the School District." *Id.* at 111:16-21. As an offer of proof, counsel sought to introduce that A.S.'s mother had "some significant health issues within her family that she was attending to, and that was interfering with her attending to those emails." *Id.* at 111:22-112:1. The hearing officer denied the request, finding the reason why Parents did not sign Colonial's requests "irrelevant" and "not really probative of anything." *Id.* at 112:7-15. He repeated that his instructions to Parents were to sign the paperwork to avoid the hearing.

### A. The Hearing Officer's Decisions

Although the witnesses and testimony significantly overlapped for the two claims, the hearing officer issued two separate decisions and orders from the two transcripts (which cross-reference each other at points).[6] ODR File Nos. 21435/18-19 and 21886/18-19. The hearing

---

[6] Creating two transcripts may not have been the most efficient management decision. Perhaps there were then-obvious reasons for doing so, which the Court will not necessarily second-guess. Nonetheless,

officer concluded that (1) Colonial did not deny A.S. a FAPE for the 2018-2019 school year (ODR 21435/18-19); (2) A.S. was permitted to attend ASUA's ESY programming (ODR 21886/18-19), placement at which Colonial was directed to fund; and (3) Colonial's in-district specialized learning support classroom would provide A.S. a FAPE for the 2019-2020 school year (ODR 21435/18-19).

The hearing officer concluded that he could not consider the Center School "solely because" Parents had not consented to the referral. So, based on this threshold determination, the hearing officer's order does not address placement at the Center School.

## B. Procedural History Since the Hearing

Parents filed their federal complaint challenging the hearing officer's rulings that the in-district school program would provide A.S. a FAPE and that he could not consider the Center School as a viable option.[7] In addition to seeking a reversal of the decision, Parents seek tuition reimbursement fees,[8] witness fees, and attorneys' fees.[9]

The parties simultaneously filed cross-motions for judgment on the administrative record earlier this year.[10] Doc Nos. 12, 14. Parents dispute the finding that there was no agreement in

---

as discussed below, Parents contest the propriety of bifurcating the issues given the resulting confusion to the transcript record.

[7] Parents do not challenge the decision ordering that A.S. could attend ASUA's ESY programming. In addition to the primary IDEA claim, Parents also requested relief under the ADA, Pennsylvania state law provisions, and Section 504 of the Rehabilitation Act of 1973. Doc. No. 1 at 13-15. At oral argument, Parents acknowledged they were no longer pursuing these specific claims.

[8] Despite the ruling that the in-district school provided a FAPE, Parents enrolled A.S. in the Center School/ASUA for the 2019-2020 academic year.

[9] Parents first sought tuition reimbursement fees and witness fees. 19-cv-2741. Rather than amend the complaint to seek attorney's fees, Parents brought a second suit. 19-cv-4325. Because both suits involve the same parties and administrative proceedings, the Court consolidated the cases. Doc. No. 24.

[10] Parents initiated a new administrative proceeding based on A.S.'s alleged recent improvement during his summer programming and sought a revision to the IEP. Following a conference before the Court,

9

principle with Colonial to transition A.S. to the Center School. Because the logistics and timeline were yet to be finalized, Parents prepared for a hearing limited to those issues. And because Parents maintain there was already an agreement, they allege that the hearing officer overreached by ignoring the resolution of the academic year placement. Colonial disputes the existence of an agreement because Parents failed to sign the NOREP and did not consent to release A.S.'s records to the Center School.

The Court granted Parents' unopposed request to supplement the administrative record with pre-hearing emails and a report card from the Center School, which A.S. attended for the 2019-2020 school year. Doc. No. 15.

## LEGAL STANDARDS

### I. Standards Applicable to the Hearing Officer

Under applicable Pennsylvania law governing IDEA administrative hearings, the parties are entitled to "present evidence and testimony, including expert medical, psychological or educational testimony." 22 Pa. Code § 14.162(m). The hearing officer's decision must "include findings of fact, discussion and conclusions of law." *Id.* § 14.162(f). And, "although technical rules of evidence will not be followed," the hearing officer's decision must be "based solely upon the substantial evidence presented at the hearing." *Id.*

### II. Judicial Review

When reviewing IDEA cases, district courts conduct a modified *de novo* review. *S.H. v. State-Operated Sch. Dist. Of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). Motions for judgment on the administrative record thus require a standard of review that differs from the traditional inquiry

---

Colonial withdrew its motion to enjoin the pending administrative proceeding. Doc. No. 32. This new proceeding was later dismissed by the administrative hearing officer. Doc. No. 34.

into genuine issues of material fact. *Mary Courtney T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 241 (3d Cir. Pa. 2009).

As part of the modified *de novo* review, the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c). For this reason, judicial review in an IDEA case is "much broader" than review in other agency actions. *Colonial Sch. Dist. v. G.K. by & through A.K.*, No. CV 17-3377, 2018 WL 2010915, at *1 (E.D. Pa. Apr. 30, 2018), *aff'd*, 763 F. App'x 192 (3d Cir. 2019).

"Factual findings from the administrative proceedings are to be considered prima facie correct." *S.H.*, 336 F.3d at 270. The reviewing district court is required to defer to the hearing officer's factual findings "unless it can point to contrary nontestimonial extrinsic evidence on the record." *Id.* at 269-70. Similarly, the court must accept the hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion." *J.G. v. New Hope-Solebury Sch. Dist.*, 323 F. Supp. 3d 716, 723 (E.D. Pa. 2018) (citing *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)). Deference to the administrative proceedings ensures that the court does not impose its own view of preferable educational policy on the states. *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993).

However, when the court receives additional evidence, it is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act." *Id.* If the court departs from the hearing officer's ruling, it should explain its reasoning for that departure. *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995), *amended* (Oct. 24, 1995).

Finally, the Third Circuit Court of Appeals has recognized a district court's general authority to remand to the hearing officer for further proceedings, especially when clarification of the record is warranted or where the hearing officer has applied an incorrect standard. *Id.* at 526. Indeed, the appellate court expressed that prohibiting the district court from "remanding for clarification would impair the court's ability to review the decision fairly." *Id.*

## DISCUSSION

This case is before the Court under somewhat unusual factual circumstances for an IDEA claim. The cross-motions raise two related questions which are answered in the same way. The threshold dispute is whether the parties had already reached an agreement on A.S.'s placement. To the extent the hearing officer based his conclusions upon a finding there was no agreement, he did so on an incomplete record. The second is whether the in-district learning support classroom would be suitable to A.S.'s needs. The hearing officer's conclusions about the in-district program are similarly not supported by a fully, properly developed record.

### I. Whether There Was an Agreement for the 2019-2020 School Year

Parents urge the Court to reverse the hearing officer on the grounds that the parties had agreed in principle that A.S. would be placed at the Center School. If there was a consensus to send A.S. there, the dispute resolution process—at least regarding the academic year—ought not to have proceeded to a hearing. Colonial disagrees. Although the NOREP contemplated placement at the Center School, Parents had neither signed the NOREP nor consented—despite three separate requests—to release A.S.'s records to the Center School. Absent these indicia of agreement, the hearing officer concluded that the 2019-2020 school year placement issue remained ripe for his decision.

The administrative hearing record, however, is incomplete. The hearing officer expressly refused testimony about Parents' lack of consent. Parents requested that they be allowed to

12

"provide an explanation as to why [A.S.'s mother] did not immediately respond to the February emails received from the School District." ODR 21435 Hr'g Tr. at 111:16-21. As an offer of proof, Parents sought to introduce that A.S.'s mother had "some significant health issues within her family that she was attending to, and that was interfering with her attending to those emails." *Id.* at 111:22-112:1. The hearing officer denied the request. He repeated that his instructions to Parents were to sign the paperwork to avoid the hearing. The reason why Parents did not sign Colonial's requests was deemed "irrelevant" and "not really probative of anything." *Id.* at 112:7-15.

That said, the Hearing Officer then specifically relied on Parents' lack of consent to find that there was no agreement between the parties to send A.S. to the Center School and that he could not even consider the Center School as a placement option. ODR 21435 Dec. at 15. Whether the Center School would be appropriate was "unknown" "solely because" Parents failed to provide consent for Colonial to communicate and collaborate. *Id.*[11] Although the hearing officer's credibility determination is entitled to special weight, the determination must be made after hearing live testimony. Here, because the hearing officer refused to allow testimony about the lack of consent, the Parents were unable to present evidence. *See* 34 C.F.R. § 300.512(a)(2). The Court cannot give the hearing officer's findings due weight if there are none.

The IDEA exists to benefit the student and "not to trap him in an IEP that no one wants." *Colonial Sch. Dist. v. G.K. by & through A.K.*, No. CV 17-3377, 2018 WL 2010915, at *15 (E.D. Pa. Apr. 30, 2018), *aff'd*, 763 F. App'x 192 (3d Cir. 2019). Similarly, the IDEA is designed to promptly resolve disputes. *T.L. by & through Latisha G. v. Pennsylvania Leadership Charter Sch.*, 224 F. Supp. 3d 421, 430 (E.D. Pa. 2016); *H.E. v. Palmer*, 220 F. Supp. 3d 574, 577 (E.D. Pa.

---

[11] Indeed, the hearing officer emphasized that Parents "have not opened the door… by not providing their consent to have the District engage with" the Center School." ODR 21435 Dec. at 15.

2016) ("[T]he IDEA contemplates and even encourages parents and educational agencies to resolve disputes without resort to contested hearings."). The hearing officer's refusal to admit testimony to determine whether there was an agreement is counter to this sensible goal.

And it leaves the Court without a basis to evaluate whether Parents refused to consent because there was no agreement to place A.S. at the Center School or for some other reason. To that end, the hearing officer suggested that Parents' insistence that A.S. continue to receive ASUA services meant there was no agreement on the Center School. ODR 21435 Dec. at 15-16; ODR 21435 Hr'g Tr. at 38:20-23. But this conclusion is belied by evidence admitted in the supplemental record.

Indeed, the parties' correspondence immediately preceding the hearing suggests—at a minimum—that Parents had not rejected placement at the Center School. The Court granted Parents' motion to supplement the record with pre-hearing emails to demonstrate the parties' understanding as to the scope of the hearing. Parents wrote both to Colonial and to the hearing officer stating that they had no objection to placement at the Center School, PSE 1 at 17, and "jointly ask[ing] that the scope of the hearing reflect this agreement," Ex. 10 (Mar. 6, 2019 Email from K. Reilly).

On the evidence currently in the record here, the Court is unable to conclude that there was an agreement. Accordingly, the Court vacates and remands ODR File No. 21435/18-19 to the hearing officer to clarify the record as to the Parents' consent or lack of consent.

## II. The Hearing Officer's Refusal to Consider Placement at the Center School

Because Parents did not provide their consent to his satisfaction, the hearing officer concluded that "[t]here is no way to gauge—either as a matter of educational planning for the IEP team, or as a matter of evidence in this proceeding—the appropriateness of a placement" at the Center School. ODR 21435 Dec. at 15. Had the hearing officer made a finding regarding the

suitability of the Center School, those factual determinations would be entitled to due weight. *H.E. v. Palmer*, 220 F. Supp. 3d 574, 582 (E.D. Pa. 2016). But, here, because the hearing officer glossed over the consideration of the Center School, his decision is supported by neither the hearing record nor the supplemental record.

First, the hearing officer based this conclusion on an incomplete record of his own engineering. *See supra* Section I. Second, the record reflects that Dr. Jones recommended the Center School during the December 2018 IEP meeting and testified about the basis of this recommendation at the hearing. Third, Colonial expressly adopted Dr. Jones's recommendation in the January and February NOREPs.

As a threshold matter, it is true that Parents impermissibly insisted on a program for A.S. which would include ASUA programming. A.S.'s mother repeatedly testified that she wanted "his occupational therapy, his OT, any ABA training, his sensory diet, to be overseen by A Step Up Academy," ODR 21435 Hr'g Tr. at 52:1-6, and that she did not visualize any programming for her son absent ASUA, *id.* at 52:17-20. And, the hearing officer is correct that Parents cannot insist on a program with ASUA. "Parents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student." *J.E. v. Boyertown Area Sch. Dist.*, 834 F. Supp. 2d 240, 246 (E.D. Pa.), *aff'd sub nom. J.E. ex rel. J.E. v. Boyertown Area Sch. Dist.*, 452 F. App'x 172 (3d Cir. 2011); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 199 (1982) (A free appropriate public education does not require "the furnishing of every special service necessary to maximize each handicapped child's potential.").

But Parents' insistence on a partnership between the Center School and ASUA—however improper—does not preclude a finding that the Center School may otherwise be an appropriate placement for A.S. The record shows that the Dr. Jones proposed the Center School at the

15

December IEP meeting. At the hearing in March, she testified that she did not know then whether the Center School was partnering with ASUA. Accordingly, her recommendation—which Colonial formally adopted in the February NOREP—was made without factoring in any involvement of ASUA.[12] And despite testifying to their preference for ASUA involvement, Parents admitted that there was no discussion of ASUA working with the Center School at the December 2018 IEP meeting. ODR 21435 Hr'g Tr. at 36:22-37:1. The supplemental record also shows Parents' written assent to placement at the Center School before a partnership between the Center School and ASUA was confirmed. *Compare* PSE 1 at 17 (Mar. 5, 2019 Email from K. Reilly to K. Romberger) ("[P]arents have no objection to…placement at the Center School in the fall") *with* ODR 21435 Hr'g Tr. at 45:6-13 (A.S.'s mother) ("[T]he partnership has not been approved by the State of Pennsylvania at that time, or even at this time.").

Nor did the Hearing Officer acknowledge Colonial's testimony that the Center School would be suitable. Ms. Berk, Director of Pupil Services, testified that Colonial had recommended the Center School for Fall 2019 based on Dr. Jones' recommendation. ODR 21435 Hr'g Tr. at 81:1-5. And, when asked what would be Colonial's "proposed placement for [A.S.] if he's not accepted by the Center School," Ms. Berk testified that they would "reconvene the IEP team." *Id.* at 92:7-12. She did not testify that the placement would necessarily be in-district. *Id.* Both Ms. Berk's testimony and the February 2019 NOREP stated that if A.S. were not accepted to the Center School, the "IEP team will reconvene as soon as possible to determine another appropriate placement option." Admin Rec. S-10 (February NOREP) at 4.

But the lack of testimony on Parents' consent is dispositive. The hearing officer drew an inference based on evidence he chose not to admit. Accordingly, the Court vacates and remands

---

[12] Parents testified that when Dr. Jones recommended the Center School, they did not know whether she was aware of a potential partnership with ASUA. ODR 21435 Hr'g Tr. at 53:4-8.

for the hearing officer to clarify the record.

### III.   The Hearing Officer's Finding that the In-District Program Provides A.S. a FAPE

Reasoning that there was no agreement to place A.S. at the Center School, the hearing officer *sua sponte* elicited limited testimony from Colonial's sole witness about the specialized learning support classroom at A.S.'s neighborhood school. This testimony was received at the end of the day after the parties had each concluded their respective presentations. Based on this eleventh-hour questioning, the hearing officer concluded that the in-district learning support program both provided a FAPE and satisfied the least restrictive environment requirement. So doing, he emphasized the in-district program's (1) small classroom size; (2) transitions managed on a "push-in" rather than "pull-out" basis; and (3) exposure to "regular education settings and typically-developing peers." Parents urge the Court to reverse the hearing officer's order that A.S. be placed in the in-district learning support program. Although the Court finds that certain of the hearing officer's findings are supported by the evidence—and accorded due weight—Parents were denied an appropriate opportunity to rebut testimony about in-district placement.

First, the record supports that the in-district program largely meets the small classroom criteria of the IEP and the IEE's recommendation. The IEE report recommends an environment of less than 12 students. According to Ms. Berk, Director of Pupil Services, there are usually between 8-10 students in the in-district classroom. ODR 21435 Hr'g Tr. at 100-01. But she acknowledged there were times were the class population might exceed 12 students. *Id.* at 101:7-14.

Second, the hearing officer found the in-district program suitable because A.S. would receive specialized services on a "push-in basis" rather than being pulled out for such services. ODR 21435 Dec. at 18. Ms. Berk testified that "Speech and language and OT [occupational therapy] push in to that [specialized] classroom to work with the students in that setting." ODR

17

21435 Hr'g Tr. at 99:14-16. There is no contrary evidence to suggest otherwise, so the hearing officer's finding that "push-in" delivery is available to A.S. is accorded due weight.

More troubling, however, is the hearing officer's express rejection of the IEE's concern that a fluid peer group is not suitable for A.S. There is no evidence in the hearing record to establish that this feature of the district classroom would be appropriate given A.S.'s documented needs. Indeed, the IEE specifically noted that a fluid peer group could be problematic for A.S. because he struggled especially with interruptions to his day. ODR 21435 Hr'g Tr. at 66:3-24 (Dr. Jones) ("My fear of having him in…a learning support kind of placement is that the number of students can differ throughout the day based upon their needs….").

The hearing officer dismissed the IEE's "abstracted concern." Instead, he relied exclusively on his "considered opinion" that a fluid peer group "should not be viewed as an absolute impediment." ODR 21435 Dec. at 18.

There are a few immediate issues here. First, the hearing officer does not point to any testimony in the record from which this Court could conclude that the impact of a fluid peer group would not be deleterious given the IEE's finding to the contrary. Second, because the discussion about the in-district program seemingly was only prompted by the hearing officer, Parents did not call their own witnesses to opine on the program. Even if the hearing officer's opinion bears out, his decision still must be "based solely upon the substantial evidence presented at the hearing." 22 Pa. Code § 14.162(f). That requirement was not met here.

The Court thus finds that the record is incomplete. Parents were given insufficient notice to address whether the in-district program was suitable for A.S.'s needs. Although Parents were able to cross-examine Ms. Berk, the record is devoid of Parents having the opportunity to affirmatively offer rebuttal testimony. The Court finds this to be due—at least in part—to Parents' understanding that the parties had agreed to placement at the Center School. Consequently,

Parents did not elicit testimony from Dr. Jones about whether the in-district option would be suitable. Nor did the hearing officer elicit testimony from her on this. At oral argument, Parents maintained that—had they known the in-district placement was at issue at the hearing—they would have called Dr. Jones and teachers from the in-district program for testimony on this issue.

Because the record is incomplete regarding whether the in-district program is appropriate for A.S., the Court does not reach whether it is the least restrictive environment for him. The hearing officer concluded that the in-district's specialized learning classroom satisfied the least restrictive environment requirement because it was A.S.'s neighborhood school. But the IDEA requires that the child be educated in the "least restrictive *appropriate* educational environment." *S.H.*, 336 F.3d at 272. The meaningful education benefit cannot be "bootstrap[ped]" with the LRE requirement. *Id.*

Because the Court finds that Parents were denied an opportunity to rebut Ms. Berk's testimony and that the hearing officer's conclusion about the in-district program's suitability lacks support in the record, the Court vacates the order and remands to supplement the record with testimony on this issue.

## IV. Remaining Procedural Violations

Finally, Parents argue that the lack of opening statements and the creation of two records constitute reversible error. Because the Court vacates and remands the decision and order in ODR File No. 21435/18-19, these alleged procedural violations are moot. For the parties' benefit, however, the Court does not find that the hearing officer abused his discretion by conducting the hearing in this manner.[13]

---

[13] The Court reviews procedural actions taken by hearing officers during the administrative proceedings for abuse of discretion. *A.S. v. William Penn Sch. Dist.*, No. CIV.A. 13-2312, 2014 WL 1394964, at *6 (E.D. Pa. Apr. 10, 2014).

CONCLUSION

For the reasons set out in this memorandum, the Court (1) denies Colonial's motion for judgment on the administrative record; (2) denies A.S.'s motion for judgment on the administrative record; and (3) vacates the decision and order in ODR File No. 21435/18-19 and remands to develop further the factual record in accordance with the issues outlined here.[14] An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

*First*, Parents argue that the failure to provide opening statements irrevocably prejudiced them because they assumed that the hearing would only address the logistics for transitioning A.S. to the Center School. Opening statements, while customary, are not required and, under Pennsylvania law, hearing officers necessarily have the authority to regulate the course of hearings. 1 Pa. Code. § 35.187(1); *D.Z. v. Bethlehem Area Sch. Distr.*, 2 A.3d 712, 734 (Pa. Commw. Ct. 2010). Although the Office of Dispute Resolution's Manual provides that "[e]ach party is given an opportunity to make an opening statement," Doc. No. 12 at 12, the manual is non-regulatory guidance. Indeed, "[n]othing in this manual is intended to represent, or have the force of, law or legal authority." ODR Manual at 1-2. *See Bethlehem Area Sch. Dist. v. Zhou*, 976 A.2d 1284, 1288-89 (Pa. Commw. 2009) ("[T]he ODR Manual does not rise to the level of a properly promulgated Pennsylvania regulation, and does not have the force of law....[T]he ODR Manual...is, at best, a statement of ODR policy."). Nor did any party voice an objection at the hearing in response to the hearing officer's announcement that there would be no opening statements. ODR 21435 Hr'g Tr. at 10:21-22. The Court views the Manual as representing something akin to a "best" or "preferred practices guide."

*Second*, Parents contend that the multiple hearing records was evidence of the hearing officer's "capricious" behavior. Doc. No. 12 at 15. The Court disagrees. The Parents' argument on this point overreaches and is unduly critical. The hearing officer explained that he issued two separate decisions because there were two separate issues—the new placement and the summer programming—operating on different timelines. ODR 21435 Hr'g Tr. at 8:18-24. Because ESY hearings proceed on an expedited 30-day timeline, *id.* at 19:15-16, the parties could appeal the different rulings using segregated transcripts. And, because the summer programming dispute played out "within the broader context" of the school placement, the transcript for the summer programming claim was incorporated into the record for the FAPE-based claim. ODR 21886 Dec. (ESY) at 11. So any additional testimony in the ESY record was admitted as part of the school placement claim.

[14] Because the Court denies both motions for judgment on the administrative record, the Court does not reach Parents' requests for expert witness fees, attorneys' fees, and costs.